605 S.E.2d 643 (2004)
164 N.C. App. 176
In the Matter of J.D., Minor Child.
No. COA03-71-2.
Court of Appeals of North Carolina.
May 4, 2004.
Charlotte A. Wade, Asheville, for petitioner-appellee Buncombe County Department of Social Services.
Attorney Advocate Judith Rudolph, Guardian Ad Litem.
Janet K. Ledbetter, Hillsborough; The McDonald Law Office, P.A., by Diane K. McDonald, Asheville, for respondent-appellant.
HUNTER, Judge.
An opinion was filed in this case on 2 December 2003. On 16 December 2003, respondent filed a petition for rehearing. On 13 January 2004, we allowed that petition, reconsidering the case with the filing of additional briefs only. The following opinion supersedes and replaces the opinion filed 2 December 2003.
Respondent appeals from an order terminating her parental rights to her daughter, J.D. (d.o.b. 25 February 1991). For the reasons stated herein, we reverse the trial court's order.
On 25 September 2000, the Buncombe County Department of Social Services ("BCDSS") filed a juvenile petition alleging that J.D. was an abused and neglected juvenile. The events that occurred prior to the filing of the petition were as follows.
On 28 August 1996, BCDSS received a child protective services report ("CPS report") stating that respondent had taken J.D. (then four years old) to an emergency room claiming that the child's fourteen-year-old half-brother, M.D., had raped her. Although a medical examination did not indicate the presence of any abnormality of her hymen, J.D. began seeing a therapist in connection with the alleged sexual abuse.
On 17 January 1997, BCDSS received a report from J.D.'s therapist that J.D. stated during a therapy session that M.D. played with her vaginal area. Thereafter, respondent acknowledged that her son was a sexual offender and needed to be placed outside the home to protect J.D. However, shortly after out-of-home placement was located for M.D., respondent's husband and J.D.'s step-father, John, returned M.D. to the family home when respondent was hospitalized for psychological problems.
The juvenile court proceeded with an action against M.D. for the sexual assault of J.D. The court was ultimately unable to adjudicate M.D. as a sexual offender because J.D. and respondent recanted their previous statements, and John and M.D. denied that J.D. had been sexually abused. Without any *644 clear evidence, M.D. was only ordered to (1) complete a sex offender specific evaluation, and (2) be placed outside the family home. Thus, a trailer was placed next to the family home for M.D. to live in that was equipped with sensory devices to prevent him from leaving undetected. However, M.D. regained access to his parents' home after his supervision by the juvenile court ended.
A third CPS report was received by BCDSS on 9 September 1997 concerning a violent fight between John and M.D. At that time, the social worker investigating the incident observed that M.D. and J.D. were both living in the family home. Respondent threatened to kill anyone who tried to take M.D. away.
On 9 October 1998, another CPS report was received by BCDSS in which J.D. disclosed to her therapist that both M.D. and John had sexually abused her. The child made no further disclosures, and the matter was not substantiated.
Next, respondent reported to BCDSS on 11 April 2000 that her step-daughter and the step-daughter's husband, Tammera and Justin respectively, smoked marijuana in the presence of their two-year-old son, Brandon. Respondent further reported that Tammera and Justin, who were living with respondent at that time, were involved in drug dealing and were being targeted for revenge because they had ripped off a drug dealer. When questioned, Justin admitted using marijuana. Tammera denied all drug usage, but later gave birth to another son on 28 July 2000 who tested positive for marijuana.
The final event that led BCDSS to file a juvenile petition with respect to J.D. occurred on 24 September 2000 when Brandon was seriously burned while in the care of respondent. Respondent's initial story was that her step-grandchild had doused himself with lighter fluid and struck a match. However, after being advised that the evidence did not support her story, respondent accused J.D. of the incident. Although Brandon never specifically stated who burned him, he did state a number of times that "grandma matched me." Thus, the preliminary results of the investigation implicated respondent as the main suspect.
Following the filing of the juvenile petition, BCDSS obtained an order for non-secure custody of J.D. on 28 September 2000. J.D. underwent a medical evaluation on 26 October 2000 which indicated abnormalities of her hymen that were not present in J.D.'s 1996 medical evaluation. The evaluating physician opined that the abnormalities suggested sexual abuse.
By order filed 11 January 2001, J.D. was adjudicated a physically and sexually abused child and a neglected juvenile in that respondent and John had "created or allowed to be created a substantial risk of serious physical injury to the child by other than accidental means...." The court ordered custody of J.D. to remain with BCDSS and that a psychological evaluation of both parents and J.D. be performed.
On 4 April 2001, a permanency planning and review hearing was held. At the hearing, the court found that (1) respondent had been suffering from significant mental health issues at least since August of 1999, (2) J.D. had to be moved from her previous foster home after BCDSS received information that respondent had threatened to take the child and run to Canada, and (3) J.D. continued to be at risk if returned to her parents' care because they continued to deny responsibility for her neglect and abuse. The court concluded that BCDSS be relieved of reunification efforts and that the permanent plan be changed to adoption.
On 27 August 2001, BCDSS filed a petition to terminate respondent's parental rights on the grounds of neglect and juvenile dependency. Prior to the hearing, respondent told BCDSS social workers that "she had separated from John ... and that she believed that he had been sexually abusing [J.D.], and had thought so for a number of years. The respondent mother gave no explanation why she had failed to protect [J.D.,]" but claimed that she would not be reconciling with John.
The termination of parental rights hearing was held on 25-28 March 2002. At the start of the hearing, BCDSS voluntarily dismissed the termination of parental rights action against John because he had "no parental rights to terminate, as he [wa]s neither the *645 biological father nor the legal father[ ]" of J.D. During the hearing, evidence was offered regarding the likelihood that respondent was responsible for setting Brandon on fire, respondent's prior and continuing mental health problems, and the family's extensive and troublesome history, most of which evidenced that J.D. had been sexually abused and neglected. As to J.D. being sexually abused, respondent testified that she did not believe M.D. "was dangerous or a threat to [J.D.], and that [respondent's] problems were limited to bad choices she made." She further testified as to her belief that John had sexually abused J.D. However, despite respondent's earlier claim that the two were separated and would not be reconciling, the court took notice that John and respondent attended court together every day during the hearing and that her apartment was in close proximity to where John was living. Based on all the evidence, the court concluded there was
clear, cogent and convincing evidence that grounds exist to terminate the parental rights of the respondent mother pursuant to N.C.G.S. 7B-1111(a)(1) in that she had neglected the minor child when the child came into the custody of the Department, she has continued to neglect the child during the entire time the child has been in the custody of [BCDSS], and there is a probability of the repetition of neglect if the minor child was returned to her care as the respondent mother has failed to correct the conditions which led to the abuse and neglect.
Therefore, the trial court determined it would be in J.D.'s best interests to terminate respondent's parental rights. Respondent appeals.
By her first assignment of error, respondent argues the trial court committed reversible error by not appointing a guardian ad litem to represent her as statutorily required when juvenile dependency is alleged as a ground for termination.
Subsection 7B-1111(a)(6) of our General Statutes provides, inter alia, that the court may terminate parental rights upon a finding that due to mental illness or any other similar cause or condition "the parent is incapable of providing for the proper care and supervision of the juvenile, such that the juvenile is a dependent juvenile within the meaning of G.S. 7B-101, and that there is a reasonable probability that such incapability will continue for the foreseeable future." N.C. Gen.Stat. § 7B-1111(a)(6) (2003). In cases "[w]here it is alleged that a parent's rights should be terminated pursuant to G.S. 7B-1111(6)," our statutes require that "a guardian ad litem shall be appointed" to act on behalf of the incapable parent. N.C. Gen.Stat. § 7B-1101 (2003). Respondent cites two cases that were reversed and remanded for a new trial by this Court due to the trial court's failure to comply with this statutory requirement.
In In re Richard v. Michna, 110 N.C.App. 817, 431 S.E.2d 485 (1993), the petitioner alleged and the trial court found that the mother was incapable of providing for the proper care and supervision of her children because of mental retardation and other mental conditions. On appeal, this Court held that (1) N.C. Gen.Stat. § 7A-289.23 (now Subsection 7B-1111(a)(6)) required that "a guardian ad litem `shall be appointed' whenever the petitioner alleges ... that parental rights should be terminated because the parent is incapable of proper care and supervision of the children due to mental retardation or other mental condition[;]" (2) although the mother failed to request a guardian ad litem, N.C. Gen.Stat. § 7A-289.23 is mandatory and does not require such a request be made; and (3) observation of the statute's mandate is required even if the mother was likely not prejudiced by the error. Id. at 822, 431 S.E.2d at 488.
Similarly in In re Estes, 157 N.C.App. 513, 579 S.E.2d 496, disc. rev. denied, 357 N.C. 459, 585 S.E.2d 390 (2003), the trial court determined that the mother was incapable of providing for the proper care and supervision of her minor child, such that the child was a dependent juvenile. On appeal, the dispositive issue was whether
the trial court could properly terminate respondent's parental rights without appointing a guardian ad litem to represent respondent at the termination hearing where the petition or motion to terminate *646 parental rights alleged, and the evidence supporting such allegations tended to show, that respondent was incapable of providing proper care and supervision to the child due to mental illness.
Id. at 515, 579 S.E.2d at 498 (emphasis added). This Court held that, where
the allegations contained in the petition or motion to terminate parental rights tend to show that the respondent is incapable of properly caring for his or her child because of mental illness, the trial court is required to appoint a guardian ad litem to represent the respondent at the termination hearing.
Id. at 518, 579 S.E.2d at 499. Accordingly, the trial court erred in failing to appoint a guardian ad litem for the mother because the petition contained numerous allegations concerning the mother's mental instability, the trial court made findings supporting those allegations, and based on those findings, concluded that the child was a dependent juvenile.
BCDSS contends that Richard and Estes are distinguishable from the present case because, although juvenile dependency was alleged in the petition as a ground for terminating respondent's parental rights, it was not pursued by BCDSS during the termination hearing. Specifically, counsel for BCDSS stated in her opening argument that BCDSS
would be asking the Court to terminate parental rights based on the fact that [J.D.] was neglected and abused in the home of origin, and there's a substantial risk that she would be abused and neglected again because [respondent] does not accept her own responsibility for what's happened to her child....
Respondent's counsel also did not address juvenile dependency as a ground for termination in her opening argument, arguing instead that
we contend that there's no evidence of neglect occurring as of today, which is the standard for termination of parental rights, and there is adequate evidence that [respondent] has complied with what DSS has asked, and that she has corrected the problems which may have occurred at the time the child was taken.
We disagree with BCDSS' contention.
While neglect was the ground BCDSS pursued during the termination hearing and ultimately found by the trial court as the basis for terminating respondent's parental rights, there was nevertheless some evidence that tended to show that respondent's mental health issues and the child's neglect were so intertwined at times as to make separation of the two virtually, if not, impossible. In fact, in its order regarding adjudication, the trial court found that a doctor's psychological assessment of respondent was credible in that respondent's "psychological problems can negatively impact on her ability to be an adequate parent and caretaker. Further, that [respondent] was and is emotionally regressed and parenting would be a challenge to her." Moreover, the trial court considered respondent's mental health issues in its disposition order by stating that
the respondent mother cannot provide a safe and permanent home for the minor child as she lacks any insight into her own significant mental health issues, how her failure to protect her daughter damaged her daughter, that she helped to create the neglectful and abusive environment, and how this has been detrimental to her daughter.
Respondent therefore should have had a guardian ad litem act on her behalf at the termination hearing.
In conclusion, the statutory mandate for appointment of a guardian ad litem was violated despite the trial court not terminating respondent's parental rights based on juvenile dependency. Subsection 7B-1111(a)(6) was clearly alleged in the petition, BCDSS offered some evidence that tended to show that respondent was incapable of caring for J.D. due to mental illness, and the trial court referenced that evidence in its order. Thus, we reverse the order terminating respondent's parental rights and remand this case for appointment of a guardian ad litem for respondent and a new trial. Our holding as to this assignment of error renders the need *647 to address respondent's remaining assigned errors unnecessary.
Reversed and remanded.
Judges McGEE and CALABRIA concur.